# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LEWIS E. BECERRA**,

       Plaintiff,

                                            **Civil No. 10-889 JAP/LFG**

vs.

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration**,

       Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** comes before the Court on Plaintiff Lewis E. Becerra's *Motion to Reverse or Remand Administrative Agency Decision* [Doc. 14], filed April 26, 2011. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

## I.    BACKGROUND

The following facts are taken from the administrative record, which was lodged with the Court following the September 23, 2010 filing of Mr. Becerra's *Complaint* against the

---

[1] Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the 14-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed. See, e.g., Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

Social Security Administration ("SSA").  [See Docs. 1, 13].

The plaintiff in this matter, Lewis E. Becerra, was born on August 19, 1956 and, accordingly, was 51 years old when he appeared on September 21, 2007 for a hearing before an Administrative Law Judge ("ALJ") on his claim for disability insurance benefits.

Mr. Becerra filed his application for benefits with a protected filing date of March 2, 2005, alleging disability due to back pain; Hepatitis C; and depression. [AR at 162].  In an undated *Disability Report*, Mr. Becerra stated that these ailments first began to bother him in April of 2000, and caused him to stop working on March 7, 2005.  According to Mr. Becerra, he was employed as a commercial truck driver, working 10 hours per day, 7 days a week, from 1990 until March of 2005, when he stopped working because he "could not endure any more pain, [and also] could not sleep."  [AR at 163].  However, through his *Disability Report*, Mr. Becerra also explained that, from October 1998 through the year 2000, he was held at the Bernalillo County Metropolitan Detention Center, in Albuquerque, New Mexico and, from 2001 until October 2003, was incarcerated at the New Mexico State Penitentiary in Santa Fe. [AR at 166].  In any event, the record reveals that, even while in prison, Mr. Becerra experienced, complained of, and was seen and treated for back pain. [AR at 162-192; 324-574].

In his *Disability Report*, Mr. Becerra stated that his job as a commercial truck driver required him to, among other things, walk; stand; sit; bend; crouch; kneel; and lift objects of under 10 pounds, but that the pain resulting from his back problems prevented him from sitting or standing for long periods of time. [AR at 163-164].  Between February 17, 2003,

and March 15, 2005, Mr. Becerra sought treatment from three different providers for deteriorating spinal discs, a pinched nerve, Hepatitis C, and depression. [AR at 165-166].

Among those providers was Edith Iwan, a certified nurse practitioner ("CNP") with Presbyterian Medical Services/Western New Mexico Medical Group in Thoreau, New Mexico. In a to-whom-it-may-concern note dated February 28, 2005, Nurse Iwan requested that Mr. Becerra be evaluated for disability insurance benefits, explaining that she had seen Mr. Becerra since November 2003, and that he had

> chronic lumbar back pain and [was] unable to do the work he [had] been doing. His diagnoses [were] surgery 1982 for removal of L5-S4 disc, degenerative joint disease and scoliosis. He had a reinjury in the lumbar area in 2001 and [had] not responded to treatment and [was] on pain medications continuously.

[AR at 221].

As of the time he completed his *Disability Report*, Mr. Becerra had been prescribed Amitriptyline, Fluoxetine, Methocarbamol, Naproxen, and Ultram.[2] [AR at 167]. The *Disability Report* indicates that the highest level of schooling Mr. Becerra completed was the seventh grade. [Id.].

On April 23, 2005, Mr. Becerra completed a *Function Report* for the purpose of detailing how his medical conditions limited his activities. [AR at 131]. He explained that, while he used to work, go to the gym, do carpentry, and fix cars, he now did not "do much

---

[2] Amitriptyline and Fluoxetine are used to treat symptoms of depression. Methocarbamol is used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. Prescription Naproxen is used to relieve pain; tenderness; swelling; and stiffness, and Ultram is used to relieve moderate to moderately severe pain. See www.nlm.nih.gov.

of anything because of the pain. . . ." [Id.].  Mr. Becerra further stated that his physical condition had affected his ability to lift; squat; bend; walk; sit; see; and get along with others. [AR at 136].  Mr. Becerra believed that he could lift a maximum of "maybe about 20 pound[s] (maybe)[,]" and could walk approximately one-half mile, though he also stated that "walking after about 3-6 hrs [he] hurt." [Id. (emphasis in original)].  According to Mr. Becerra, he would need between 30 and 40 minutes of rest before he could resume walking. [Id.].  He also stated that he (1) was unable to pay attention for long periods of time; (2) was "okay" at following spoken instructions (when he could remember them); (3) handled stress poorly; (4) exhibited behavior he called "not good;" and (4) argued often.  [AR at 136-137].  Mr. Becerra reported that he needed to be reminded to take his medications, because he "forg[o]t a lot." [AR at 133].  As for hobbies, interests, and activities, Mr. Becerra explained that he talked on the phone with his children "once in a while;" read; and watched television, although even watching TV was difficult because, after some time he would begin to hurt. [AR at 135]. In response to a question asking how his physical condition affected his ability to pursue his hobbies and interests, Mr. Becerra wrote, "Well for one thing, I hurt like hell and it's not getting any better." [Id.].  Finally, while Mr. Becerra described himself as able to tend to his personal hygiene; do laundry; and prepare simple meals for himself, he represented that he was otherwise unable to do other work around his house or go shopping. [AR at 132-135].

A *Function Report - Adult - Third Party* completed at about the same time by Emily Garcia, Mr. Becerra's mother, was largely repetitive of Mr. Becerra's own report. [AR at

139-146].

On August 22, 2005, at the request of the SSA, Mr. Becerra was seen by Carl Adams, Ph.D., of Disability Determination Services, for a mental status examination. [AR at 253]. According to Dr. Adams, Mr. Becerra (1) was oriented to time, place, and person; (2) exhibited average to low-average long- and short-term recall; (3) was not delusional; (4) presented with grossly intact insight; (5) demonstrated adequate life-management and decision-making judgment; (6) was not limited in understanding and remembering detailed or complex instructions; and (7) had no complaints of limitations in social interactions. [AR at 253, 261].

At the same time, Dr. Adams also described Mr. Becerra as angry, resentful, bitter, and sarcastic. [Id.]. Dr. Adams recounted a history of physical abuse over the course of Mr. Becerra's upbringing, and wrote that the reason Mr. Becerra advanced no farther than the seventh grade was, according to Mr. Becerra, that he was expelled, having been "singled out for discipline" following an altercation with a white student. According to Dr. Adams, Mr. Becerra "blame[d] the [school] principal for destroying his dreams." [AR at 259].

At the age of 15, Mr. Becerra began working on oil rigs and continued in this line of work until he was 21 years old, at which time he switched careers and obtained a commercial driver's license. Mr. Becerra drove cross-country for 22 years until he was charged with the criminal penetration of a minor. He was subsequently tried, convicted, and sentenced to a term of imprisonment. [AR at 259]. During his incarceration, Mr. Becerra's driver's license expired and he told Dr. Adams that the State of New Mexico had since refused to reissue it.

[AR at 260].  Following his release from prison, Mr. Becerra worked as a lube technician and maintenance man at two truck stops near Grants, New Mexico. [AR at 259].

Mr. Becerra told Dr. Adams that, while in prison, he was accidentally hit in the ribs with a pry bar.  Following that incident, a prison employee punched Mr. Becerra in the same area, which, in turn, caused injury to his back, particularly the L2 through S1 vertebrae. [AR at 259].  Shortly before his examination by Dr. Adams, Mr. Becerra underwent an MRI, the results of which were not available at the time he saw Dr. Adams.  Mr. Becerra told Dr. Adams that, before prison, he underwent a laminectomy,[3] and that, at the time of Dr. Adams' examination, he had an appointment for an evaluation of his back and for possible surgery. Dr. Adams assessed Mr. Becerra as "a good candidate for vocational rehabilitation services[, noting that i]f his back complaints [were] not prohibitive, then Division of Vocational Rehabilitation might be able to assist him in getting his driver's license and regaining his commercial driver's license so that he could go back to work driving a truck." [AR at 261].

Importantly, notwithstanding Mr. Becerra's "chronic complaints of back pain[,]" Dr. Adams noted that Mr. Becerra "appeared to be in good physical condition." [AR at 258].  Dr. Adams continued:

> In observing him walk from the reception room down the hall to the consultation room, there was no sign of discomfort or pain behavior.  He sat comfortably throughout the interview without

---

[3]  A laminectomy is a spine operation to remove the portion of the vertebral bone called the lamina, which is a posterior arch of the vertebral bone lying between the spinous process.  See http://en.wikipedia.org/wiki/Laminectomy.

> having to adjust himself for comfort.  He also rose from the
> chair without difficulty and proceeded down the hall and out the
> building, again with no signs of pain or discomfort.

[Id.].  Dr. Adams diagnosed Mr. Becerra with, among other things, pain disorder due to both

psychological factors and a general medical condition, and rated his global assessment of

functioning ("GAF")[4] at 65. [AR at 261].

Mr. Becerra's claim for benefits was denied on September 1, 2005. [See AR at 57].

On September 22, 2005, Mr. Becerra completed a *Disability Report - Appeal*, in

which he explained that his back pain was getting worse. [AR at 147].  He stated that he was

under a doctor's orders not to work, and that while he had been scheduled in August 2005

with two different doctors to be seen for his Hepatitis C and also to undergo an MRI, he was

unable to keep either appointment because the doctors required up-front payment, and Mr.

Becerra had no income. [AR at 148].  On September 26, 2005, Mr. Becerra filed a *Request

for Reconsideration*, and appointed attorney Michael D. Armstrong as his representative.

[AR 79-81].

On October 18, 2005, Mr. Becerra filled out a second *Function Report*, in which he

repeated that he was not able to do very much because of his back pain, and that the pain

interfered with his sleep. [AR at 123-124].  Mr. Becerra stated that his condition affected his

ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and see.  According to Mr.

---

[4] "The GAF is a subjective rating on a scale of 1 to 100 of 'the clinician's judgment of the
individual's overall level of functioning.'" Wilson v. Astrue, 602 F.3d 1136, 1142 n.3 (10th Cir. 2010)
(*quoting* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS (Text Revision 4th ed.2000) at 32.

Becerra, his medications[5] altered his moods such that he had difficulty getting along with others. [AR at 128].  In this regard, the information provided in the second report was generally consistent with that provided in the initial report.

On the other hand, there also were some not insubstantial discrepancies between the two reports.  For example, whereas he originally stated that he was unable to pay attention for very long, Mr. Becerra now represented that he was able to pay attention for "a long time." [Compare AR at 128 and 136].  While Mr. Becerra initially stated that he was unable to go shopping and, instead, needed his mother to shop for him, he now indicated that he did in-store shopping for food and personal-hygiene items.  [Compare AR at 126 and 134.  In his first *Function Report*, Mr. Becerra wrote that he spent time with others, talking with his friends and/or children "once in a while." [AR at 135].  In the second report, he stated that he spent time with others "everyday." [AR at 127].  Originally Mr. Becerra explained that, although he engaged in hobbies including, but not limited to, watching TV and reading, he began to hurt after lying down for a while. [AR at 135].  In his second report, however, Mr. Becerra asserted that he read every day for four hours. [AR at 127].  Whereas Mr. Becerra first complained that his ability to engage in hobbies was affected by the fact that he "hurt like hell[,]" in the second *Function Report*, he wrote "None" in response to the question asking for a description of any changes in his hobbies and interests since the onset of his condition. [AR at 127].  Finally, in contrast to having originally checked "Yes" in response

---

[5] In addition to the medications Mr. Becerra listed in his *Disability Report*, he now also was taking Tramadol, which is used to control pain, and Promethazine, which, among other uses, may be prescribed to prevent and control nausea.  See www.nlm.nih.gov.

to a question asking whether he had noticed any unusual behaviors, and explaining "it's not good," in the second report, Mr. Becerra simply checked "No." [Compare AR at 129 and 137].

By letter dated December 5, 2005, Mr. Becerra was informed that his *Request for Reconsideration* had been denied. [AR at 82-84]. On January 24, 2006, Mr. Becerra, through Mr. Armstrong, requested a hearing before an ALJ. [AR at 85].

A second *Disability Report - Appeal* completed on January 25, 2006 by counsel was consistent with the one Mr. Becerra completed on September 22, 2005, except that the second document additionally stated that (1) Mr. Becerra's Hepatitis C was getting worse; and (2) Mr. Becerra was receiving therapy for anger issues he was experiencing as a result of "having to stay home all the time and being deppressed [sic]." [AR at 155].

On September 21, 2007, the ALJ held a hearing at which Mr. Becerra, represented by Mr. Armstrong, appeared and testified.  Mr. Becerra confirmed that he was expelled from school in the seventh grade, and never returned.  He attempted to earn his GED while incarcerated, but was unsuccessful because he required one-on-one tutoring, which was unavailable in prison.  [AR at 590, 604].  Individual tutoring was necessary, Mr. Becerra apparently was told, because he was starting from the equivalent of a third or fourth grade educational level.  [AR at 604].  Mr. Becerra testified that he served five years in prison, and was released on October 14, 2003.  According to Mr. Becerra, he was innocent of the charge against him (criminal sexual penetration), and claimed that, at the time of the hearing, The

Innocence Project[6] was working to help him clear his name. [AR at 589-591].

Mr. Becerra testified that he was married for 23 years, before he and his wife divorced in 1999. He had three adult children, ages 28, 24, and 22, to whom he described being "very close." [AR at 592-593]. Mr. Becerra stated that he was in daily contact with his children. [AR at 593].

Since his release from prison, Mr. Becerra was living with his mother. He testified that he received approximately $230.00 per month in state assistance, and another $120.00 in food stamps. Mr. Becerra explained that he worked from 2004 to early 2005 lubing trucks at the Petro Truck Stop near Grants. He stated that he worked at Petro for about five months until he was forced to quit because his back problems prevented him from maneuvering under the trucks, as his job required. [AR at 594-595]. Mr. Becerra then moved on to Love's Truck Stop, where he worked for two or three months as a maintenance man, keeping the facility clean. [AR at 595]. He stated that Nurse Iwan, whom he had been seeing an average of three times a month since October 2003, told him to quit his job due to the severity of his back problems and Hepatitis C. When pressed by the ALJ, Mr. Becerra could not explain the discrepancy between his contention that he worked all of 2004, and his testimony that he worked for a combined seven or eight months at the two truck stops. [AR at 597].

---

[6]  The Innocence Project is a national litigation and public policy organization that, among other things, works to assist prisoners to prove their innocence through DNA testing.  See http://www.innocenceproject.org.

Turning to the Hepatitis C, the ALJ next asked Mr. Becerra whether he had received treatment for the condition.  Mr. Becerra replied that, though he and Nurse Iwan had tried to arrange for treatment, he never actually received care because he lacked "the financial status to get it." [AR at 600].  Nurse Iwan did, however, refer Mr. Becerra to someone he was able to remember only as "Dr. Pat," and whom he described as "some kind of counselor for hepatitis C." [AR at 601].  Dr. Pat prescribed anti-depressants in an attempt to prepare Mr. Becerra for the Hepatitis C treatment he never received. [Id.].

Returning to Mr. Becerra's back problems, Mr. Armstrong noted that Mr. Becerra was moving about in his chair, and during the hearing stood, then sat, then moved around some more.  In response to counsel's question how long he was able to sit before needing to reposition, Mr. Becerra replied, "Not very long.  Maybe about five or 10 minutes." [AR at 606].  When asked how long he could stand, Mr. Becerra said about 10 or 15 minutes. [Id.]. He explained that, while he could walk for about 10 minutes, he was unable, for example, to shop with his mother because he would experience a pounding sensation in his back and heel. [AR at 607].  Mr. Becerra testified that on the drive from Grants to the administrative hearing in Albuquerque, he had to stop two times "[b]ecause of [his] back and [he] had to stretch because [his] legs go numb." [AR at 608].  According to Mr. Becerra, before he was injured in prison, his back "was fine." [AR at 609].

Mr. Becerra then testified to his belief that, since his onset date of March 2005, his health had gotten worse, and that the reason for the decline was he was forced to do work that required lifting, bending, and climbing stairs. [AR at 608].  Mr. Becerra told the ALJ that

11

he had undergone MRIs, but when asked what doctors suggested for follow-up treatment, Mr. Becerra stated, "In order for them to see me I need to pay them something and I ain't got the financial means to see a doctor." [AR at 609].  He then stated, however, that at least one prison doctor, in either 2000 or 2001, recommended back surgery and disc removal, which she predicted would likely be successful. [Id.].  Mr. Becerra further testified that he (1) was unable to sit in a bathtub because he could not squat down, (2) could not help his mother feed her animals because he could not bend, and (3) dressed himself using just one hand due to his inability to bend over. [AR at 612-613].  On a scale of 1 to 10, Mr. Becerra rated his pain at "about 5 1/2 or 5[,]" and concluded, "I can't do anything.  I can't really go about anywhere." [AR at 611, 613].

In a written decision dated December 17, 2007, the ALJ denied Mr. Becerra's claim for insurance benefits, finding that Mr. Becerra was not disabled for purposes of the Social Security Act. [AR at 64].  Having considered the entire record, including (1) testimony from the evidentiary hearing; (2) the opinions of treating and non-treating sources; and (3) the determinations of State agency medical consultants, all within the framework of the applicable five-step sequential evaluation, the ALJ concluded, at step five, that in light of Mr. Becerra's age, education, work experience, and residual functional capacity, there existed in significant numbers jobs in the national economy that Mr. Becerra was capable of performing, even though he was unable to perform any of his past work. [AR at 57-65].  Among other things, the ALJ, who did not take testimony from the vocational expert who also was present at the hearing, found that Mr. Becerra "lacked credibility" inasmuch as his

complaints about and testimony regarding his pain and limitations "were not supported by the medical evidence in the disabling degree alleged. . . ." [AR at 63].  Accordingly, the ALJ found that Mr. Becerra was capable of performing a full range of light work and, therefore, was not disabled for purpose of the Social Security Act. [AR at 64].

On January 15, 2008, Mr. Becerra, through Mr. Armstrong, requested review of the ALJ's decision. [AR at 53].  Thereafter, on May 13, 2008, and December 15, 2008, Mr. Armstrong submitted additional evidence[7] that he asked be made part of the record in Mr. Becerra's case. [AR at 10, 50].  Having considered the additional evidence, the Appeals Council, on July 23, 2010, denied Mr. Becerra's request for review. [AR at 4-6].

On September 23, 2010, Mr. Armstrong, on Mr. Becerra's behalf and pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), filed the *Complaint* that is now before the Court. [See Doc. 1 at 1].  On April 26, 2011, Mr. Becerra filed his motion to reverse or remand, arguing that (1) the ALJ's determination as to Mr. Becerra's credibility was not supported by substantial evidence; (2) the ALJ erred at step five of the sequential evaluation by relying solely on the Medical-Vocational Guidelines and not consulting a vocational expert; and (3) both the ALJ and then the Appeals Council failed to consider the additional evidence submitted by Mr. Armstrong. [See generally Doc. 15].  The Commissioner filed a response on August 8, 2011, and, on August 18, 2011, Mr. Becerra filed a reply and notice of briefing complete. [See Docs. 18-20].

---

[7]  The additional evidence consisted of a letter from Brenda McCoy, Mr. Becerra's life partner, in which Ms. McCoy described Mr. Becerra's condition and what she viewed as his limitations [AR at 51-52], as well as additional medical records, evaluations, and assessments. [AR at 11-49].

## II.   ANALYSIS

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the denial of benefits to Mr. Becerra only if it determines that the denial is (1) not supported by substantial evidence; or (2) based on legal error.  See Kauser v. Astrue, 638 F.3d 1324, 1326 (10th Cir. 2011). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Raymond v. Astrue, 621 F.3d 1269, 1271-72 (10th Cir. 2009) (internal quotations omitted). By contrast, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). A finding of "no substantial evidence" should be made "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting Hames v. Heckler, 707 F.2d 162, 164 (5th Cir.1983) ).

In order to determine whether a decision is supported by substantial evidence, the Court must "meticulously" examine the record as a whole. Musgrave, 966 F.2d at 1374. However, the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Id. Additionally, while

> [t]he record must demonstrate that the ALJ considered all of the evidence[. . . ] an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

In assessing whether a claimant is disabled,[8] the ALJ is required to follow a five-step sequential evaluation process, with the claimant shouldering the burden of establishing a prima facie case of disability at steps one through four.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  At step one, the claimant must demonstrate that he is not presently engaged in substantial gainful activity.  Step two requires the claimant to show that he has a medically severe impairment or combination of impairments.  If, at step three, the claimant shows that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits.  If the claimant cannot meet a listing at step three, he continues to step four, which requires him to show that the impairment (or combination of impairments) prevents him from performing his past work.  If the claimant satisfies his burden, the burden of proof shifts to the Commissioner at step five "to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given his age, education, and work experience."  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).

Again, while the record must demonstrate that the ALJ *considered* all of the evidence, the ALJ is not required to *discuss* every piece of evidence.  Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Instead, the ALJ must discuss the evidence that supports his decision, as well as any uncontroverted evidence he chooses not to rely upon and

_____

[8] The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §§ 423(d)(1)(A).

significantly probative evidence he rejects.  Id. at 1010.  Additionally, while the ALJ must provide an evidentiary discussion and explanation of reasoning sufficient to enable meaningful judicial review, he need not employ any "magic" words, nor must he use any particular language or adhere to a particular format in conducting his analysis.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3rd Cir. 2009).

"'A claimant's subjective allegation of pain is not sufficient in itself to establish disability.'"  Branum v. Barnhart, 385 F.3d 1268, 1273 (10th Cir. 2004) (quoting Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir.1993)).  Accordingly, before the ALJ is even required to consider any subjective evidence of pain, "the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." Thompson, 987 F.2d at 1488. The Tenth Circuit laid out the framework for analyzing such claims in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  In Luna, the circuit instructed courts to consider (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain is, in fact, disabling.  Luna, 834 F.2d at 163-164.  To be sure, "[a]s is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  With the foregoing in mind, the Court now turns to the arguments set forth in Mr. Becerra's motion.

**A.     Whether the ALJ's Adverse Credibility Ruling is Supported by Substantial Evidence**

Mr. Becerra argues that the ALJ did not base his credibility determination upon substantial evidence because the ALJ ignored objective evidence in support of Mr. Becerra's subjective complaints of pain.  According to Mr. Becerra, the ALJ failed to "point to any specific medical evidence that he believed was unsupportive of Mr. Becerra's allegations of pain [and, i]nstead the ALJ relied on the unfounded allegation that Mr. Becerra had given inconsistent statements regarding his pain." [Doc. 15 at 6].  Mr. Becerra maintains that the ALJ failed to give appropriate weight to the opinions of Nurse Iwan and that, if he had properly considered Nurse Iwan's opinions under the Luna framework (which, Mr. Becerra insists, the ALJ failed even to mention, much less apply) it would have become apparent that Nurse Iwan's treatment records provided the required "loose nexus" between Mr. Becerra's condition and his subjective allegations of pain. [Id. at 7-11].  Instead of meaningfully discussing and analyzing the medical evidence to assess credibility, submits Mr. Becerra, the ALJ reached a credibility decision that is "merely a conclusion in the guise of findings." [Id. at 6].

Notwithstanding that "[c]redibility determinations are peculiarly the province of the finder of fact . . . f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Wilson v. Astrue, 602 F.3d 1136, 1144 (10th Cir. 2010) (internal quotations omitted).  Indeed, where, as here, testimony on subjective pain is critical, the ALJ must articulate specific reasons for

questioning the claimant's credibility. A failure to do so "fatally undermines the Commissioner's argument that there is substantial evidence adequate to support his conclusion that claimant is *not* under a disability." Id. (internal quotations omitted) (emphasis added). Factors the ALJ should consider in assessing the credibility of a claimant's testimony on pain include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Branum, 385 F.3d at 1273-74 (*quoting* Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir.1991).

In this case, Mr. Becerra's assertion that the ALJ failed to consider objective medical evidence tending to establish a pain-producing impairment is simply not supported by the record, which demonstrates that the ALJ specifically took into account the following medical tests and their results:

(1) X-rays from March 28, 2001, showing herniated discs at L3-S1;

(2) an X-ray of Mr. Becerra's lumbar spine (also from March 28, 2001), showing scoliosis and "abundant degenerative change;"

(3) a February 6, 2003 X-ray of the lumbar spine, showing degenerative joint disease;

(4) an MRI taken February 17, 2003, showing (a) far left lateral disc protrusion at the L4-5 level, (b) mild circumferential disc bulging at L1-2 and L2-3, (c)

evidence of old surgery at L5-S1, and (d) incidental note of a Tarlov cyst[9] in the sacrum; and

(5) X-rays taken July 8, 2005, showing dextroconvex scoliosis of the thoracic and levoconvex scoliosis of the lumbar spine with degenerative changes.

[AR at 60-62].   The ALJ also referenced medical records from the New Mexico Department of Corrections, indicating that, while incarcerated, Mr. Becerra was treated in 2000, 2001 and 2002 for, *inter alia*, severe low back pain; bilateral shoulder pain; and pain and numbness in both legs.  [AR at 60].  In addition, the ALJ noted that medical records from 2005 from Presbyterian Medical Services showed that Mr. Becerra was treated there for back pain. [AR at 61].   On the basis of this evidence, the ALJ concluded that Mr. Becerra's medically determinable impairments could reasonably be expected to produce the symptoms from which he suffered. [Id.].   Accordingly, while he arguably could have used—but was not required to use[10]—language more closely tracking that from Luna, the ALJ clearly found that objective medical evidence established that Mr. Becerra was experiencing pain-producing impairments.  See Luna, 834 F.2d at 163-164.

---

[9]  According to the National Institute of Health's National Institute of Neurological Disorders and Stroke, Tarlov cysts are sacs filled with cerebrospinal fluid that most often affect nerve roots in the sacrum, the group of bones at the base of the spine. These cysts (also known as meningeal or perineural cysts) can compress nerve roots, causing, among other things, lower back pain, sciatica, headaches, and loss of feeling or control of movement in the leg and/or foot.   See http://www.ninds.nih.gov/disorders/tarlov_cysts/tarlov_cysts.htm.

[10]  See Diaz, 577 F.3d at 504 (ALJ is not required to employ any "magic" words or use any particular language or adhere to a particular format in conducting his analysis).

Mr. Becerra next submits that the ALJ did not properly weigh Nurse Iwan's opinions and medical assessments because, if he had, he would have concluded that her opinions and assessments established the "loose nexus" between Mr. Becerra's impairments and his subjective allegations of pain, as is required under Luna's second step.   [See Doc. 15 at 8-9]. Mr. Becerra's contention is not supported by the record, which demonstrates that the ALJ expressly considered (1) records from 2005, showing that Nurse Iwan treated Mr. Becerra for chronic back pain and Hepatitis C; (2) a September 9, 2006 *Medical Assessment of Ability to do Work-Related Activities*, showing that Nurse Iwan assessed Mr. Becerra as being in severe pain and rating him as having severe limitations in five out of eight relevant categories; and (3) a subsequent *Medical Assessment* dated October 1, 2007 and stating that Mr. Becerra could not do any manual labor. [AR at 62-63].   The ALJ also noted that, notwithstanding Nurse Iwan's opinions about the severity of Mr. Becerra's impairments, she examined and certified him on February 7, 2005 as meeting the medical requirements to receive his commercial driver's license. [AR at 63-64; 294-296].   Three weeks later, however, on February 28, 2005, Nurse Iwan wrote her to-whom-it-may-concern note, explaining that Mr. Becerra "ha[d] chronic lumbar back pain and [was] unable to do the work he ha[d] been doing . . . [p]lease evaluate for Social Security Disability." [AR at 221].   Thus, contrary to Mr. Becerra's assertion that the ALJ failed to consider evidence from Nurse Iwan as to Mr. Becerra's inability to work, which evidence he believes "directly correlates with the criteria necessary to substantiate a claim of disabling pain under Luna[,]" [Doc. 15 at 9], the ALJ considered—but nevertheless rejected—Nurse Iwan's opinions. [AR at 63].

As the Tenth Circuit has explained, "[o]ne of the factors used to evaluate opinion evidence is the treatment relationship; opinions from 'treating sources' generally are entitled to more weight." Nichols v. Astrue, 341 Fed.Appx. 450, 453 (10th Cir. 2009) (*citing* 20 C.F.R. § 416.927(d)(2)).   "Treating source," in turn, is defined in pertinent part as a "physician, psychologist, or other *acceptable medical source*. . . ." 20 C.F.R. § 416.902 (emphasis added).   But a certified nurse practitioner, like Nurse Iwan, is not considered an acceptable medical source.   Nichols, 341 Fed.Appx. at 453-454 (*citing* 20 C.F.R. § 416.913(d)(1)).   Still, "evidence and opinions from [certified nurse practitioners] *may* be considered by an ALJ to document the nature and severity of a claimant's impairments." O'Brien v. Astrue, 2011 WL 1298755, at *7 (N.D.N.Y. Mar. 31, 2011) (*citing* 20 C.F.R § 404.1513(d)(1)) (emphasis added).   Indeed,

> [e]vidence from "other sources," including nurse practitioners, may be based on special knowledge of the individual and may provide insight into the severity of an impairment and how it affects the claimant's ability to function. Opinions from other medical sources are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source.

Kingsbury v. Astrue, 2008 WL 4826139, at *10 (D.Kan. Nov. 5, 2008) (*citing* SSR 06-03p, 2006 WL 2329939, at **2, 3, 5 (Aug. 9, 2006).

In this case, the ALJ explained that, after considering Nurse Iwan's opinions, he discounted them because (1) he did not accept them as coming from an acceptable medical source; and (2) they were neither supported by nor consistent with the overall medical record and evidence. [AR at 63].   The ALJ pointed specifically to Nurse Iwan's *Medical Assessments* from September 26, 2006 and October 1, 2007, in which she rated Mr. Becerra as being severely limited with respect to the abilities to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule; (3) maintain regular attendance and be punctual within customary tolerance; (4) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and (5) complete a normal workday without pain- or fatigue-related interruptions and without an unreasonable number/length of rest periods. [AR at 300, 320].  Nurse Iwan's opinions stood in contrast to those of a State agency medical consultant who, in a psychiatric review, found Mr. Becerra to be experiencing no restrictions in activities of daily living; no difficulty maintaining social functioning; no extended episodes of decompensation; and only mild difficulties in maintaining concentration, persistence or pace. [AR at 274].  Nurse Iwan's opinions also appeared to contradict another State examiner who, in a *Physical Residual Functional Capacity Assessment*, concluded, among other things, that Mr. Becerra was capable of (1) walking for about 3 to 6 hours at a time; (2) lifting approximately 20 pounds; and (3) engaging in unlimited pushing and pulling (such as in the operation of hand and foot controls). [AR at 278-285].

Nor were Nurse Iwan's opinions in accord with those of Carl Adams, who observed, as explained more fully above, that Mr. Becerra sat through his evaluation without exhibiting signs of pain or discomfort, and appeared to be in good physical condition [AR at 258].  Dr. Adams also rated Mr. Becerra's GAF at 65, [AR at 261], a middle-range score, "indicating [s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well. . . ." Pisciotta v. Astrue, 500 F.3d 1074, 1079 (10th Cir. 2007) (internal quotations omitted).    Finally, Nurse Iwan's opinions regarding the severity of Mr. Becerra's impairments, and her conclusion that, as of February 28, 2005, he was "unable to do the work he [had] been doing" was inconsistent with her own February 7, 2005 certification clearing Mr. Becerra for a new commercial driver's license. [AR at 221, 294-296].  In short, substantial evidence supports the ALJ's decision to discount Nurse Iwan's opinions.

For his final Luna-based argument, Mr. Becerra claims that "the ALJ ignored substantial medical evidence documenting the chronicity and unrelenting nature of Mr. Becerra's chronic disabling pain." [Doc. 15 at 9].  Mr. Becerra also contends that the ALJ did not take account of  treatment records generated by Nurse Iwan, and then "conclusively and arbitrarily concluded that Mr. Becerra's pain complaints were unsupported by the evidence in the record. . . ." [Id.].

Under the third prong of Luna, the ALJ is to consider whether, in light of all the evidence, both objective and subjective, the claimant's pain is in fact disabling.  As explained

more fully above, the ALJ discounted the objective medical evidence as it was reflected in Nurse Iwan's treatment notes and records.  Other objective evidence considered by the ALJ included (1) "several reports of some symptoms magnification" during Mr. Becerra's therapy; (2) medical records questioning Mr. Becerra's compliance with his treatment regimen; (3) records indicating that at least one physician "did not see anything [with regard to Mr. Becerra's back] that he would recommend any surgery on[;]" and (4) a *Physical Residual Functional Capacity Assessment* concluding that, notwithstanding his back problems, Mr. Beecerra was capable of performing light forms of work.  [AR at 13, 60-61].  This evidence contradicted Mr. Becerra's representation that he was entirely unable to work.  [AR at 79, 80, 147].

Finally, Mr. Becerra himself provided contradictory information with respect to (1) his ability to pay attention  [Compare AR at 128 and 136]; (2) his ability to shop for himself [Compare AR at 126 and 134]; (3) the amount of time he was able to spend with others [Compare AR at 127 and 135]; (4) the toll his impairments had taken on his ability to pursue his hobbies and interests  [Compare AR at 127 and 135]; and (5) whether he was exhibiting any unusual behaviors.  [Compare AR at 127, 129, and 137].  Having considered all of this evidence, the ALJ ultimately concluded that, while Mr. Becerra's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, [his] statements concerning the intensity, persistence and limiting effects of those symptoms [were] not entirely credible." [AR at 60].  In light of the foregoing, the Court determines that substantial evidence supports the ALJ's determination that Mr. Becerra was not entirely

credible with respect to testimony concerning the intensity, persistence, and limiting effects of his symptoms. [See id.].

**B.      Whether the ALJ Erred at Step Five of the Sequential Analysis by Conclusively Applying the Grids and Not Consulting a Vocational Expert**

Mr. Becerra next argues that it was error for the ALJ, at step five of the sequential evaluation process, to have relied solely and conclusively on the Medical-Vocational Listings of 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grids").  Mr. Becerra believes that the ALJ should instead have consulted a vocational expert for a determination as to how Mr. Becerra's nonexertional limitations impacted his ability to perform at a particular exertional level. [Doc. 15 at 11-13].  The Commissioner responds that conclusive reliance on the Grids was appropriate here, since the ALJ found Mr. Becerra's subjective allegations as to the extent of his pain to be not credible. [Doc. 18 at 8-9].

Because the ALJ determined that (1) Mr. Becerra was no longer working (step one); (2) Mr. Becerra suffered from a severe impairment (step two); (3) this impairment did not meet or equal the listings (step three); and (4) Mr. Becerra could not perform his past relevant work as a truck driver (step four), [see AR at 59, 64], the burden shifted to the Commissioner to show, at step five, that Mr. Becerra retained the residual functional capacity ("RFC") to do other work that exists in the national economy.  See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).  It is at step five that the Grids become applicable.  See Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004).

The SSA created the Grids "to help evaluate the step five requirement, whether or not there are sufficient jobs in the economy that the claimant can perform given his or her age, education, and work experience. . . ." Allen, 357 F.3d at 1142. Through the Grids, the Commissioner has taken administrative notice of the number of jobs that exist in the national economy at the various functional levels—sedentary, light, medium, heavy, and very heavy. Thus,

> "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule," the existence of jobs in the national economy for that claimant is established, and the rule "directs a conclusion as to whether the individual is or is not disabled."

Channel v. Heckler, 747 F.2d 577, 578 (10th Cir. 1984) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00(a)–(b)). However, "the grids may not be applied conclusively in a given case unless the claimant's characteristics *precisely* match the criteria of a particular rule." Id. at 579 (emphasis added).

"How the ALJ should proceed on step five to make the ultimate determination that the claimant is disabled or not depends on whether the claimant alleges an exertional impairment (strength-related), or a nonexertional impairment (pain or mental problems), or both." Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993). Tenth Circuit authority instructs that "resort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain and mental impairments[, in which case t]he grids may serve only as a framework to determine whether sufficient jobs" exist. Hargis, 945 F.2d at 1490; see

26

also Campbell v. Bowen, 822 F.2d 1518, 1522 n.2 (10th Cir. 1987) ("where nonexertional impairments are . . . present, the grids alone cannot be used to determine the claimant's ability to perform alternative work").  In short, the ALJ may not rely conclusively on the Grids unless he finds that the benefits claimant (1) has no significant nonexertional impairment; (2) can do the full range of work at some RFC level on a daily basis; and (3) can perform most of the jobs in that RFC level.  Thompson, 987 F.2d at 1488.

In this case, the Commissioner maintains that the ALJ's conclusive use of the Grids was appropriate because (1) the mere presence of pain does not preclude reliance on the Grids, since "disability" means more than the inability to work without experiencing pain; and (2) the ALJ had already found Mr. Becerra's testimony regarding pain to be not entirely believable. [Doc. 18 at 8-9].  In support, the Commissioner relies on Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994) for the proposition that "[r]eliance on the Grids is proper when a claimant's pain testimony is not fully credible."  [Id.].

In the Court's view, however, Castellano is distinguishable because in addition to refusing to accept the opinion of the claimant's treating physician that the claimant was totally disabled, the ALJ in Castellano also rejected as unsupported in the record the "treating physician's opinion that [claimant's] physical problems [were] severe."  Castellano, 26 F.3d at 1029 (emphasis added).  By contrast, with respect to Mr. Becerra, the ALJ expressly found, at step two, that Mr. Becerra experienced "the following severe combination of impairments: chronic back pain; degenerative disc disease; hepatitis C and a dysthymic disorder." [AR at 59 (emphasis added)].  The Tenth Circuit has explained that an ALJ's step-

27

two finding of severe pain "makes it impossible to conclude at step four that [the claimant's] pain was insignificant. . . ."  Baker v. Barnhart, 84 Fed.Appx. 10, 13 (10th Cir. 2003).  Yet a finding "that the claimant has no significant nonexertional impairment" is a prerequisite to conclusive application of the Grids.  Thompson, 987 F.2d at 1488; see also Ramirez v. Astrue, 255 Fed.Appx. 327, 330-331 (10th Cir. 2007) (because a nonexertional impairment can have a negligible effect on the range of jobs available, ALJ may rely conclusively on the Grids if he finds, among other things, that the claimant has no significant nonexertional impairment).

In this case, the ALJ did not find that Mr. Becerra had no significant nonexertional impairment.  Instead, he found, at step four, that Mr. Becerra's "testimony and reports of pain and functional restrictions were not supported by the medical evidence *in the disabling degree alleged*. . . ." [AR at 63 (emphasis added)].  However, pain can be severe without being disabling.  See Frady v. Astrue, 2010 WL 3853201, at *4 (W.D.N.C. Sept. 8, 2010) (finding back, cervical, shoulder, and knee pain to be were severe but not disabling impairments).  And that is what the ALJ found.  But, as Baker instructs, this finding of severity precludes a contemporaneous finding that Mr. Becerra's pain was insignificant.  See Baker, 84 Fed.Appx. at 13 ("The use of the grids is inappropriate when a claimant has a nonexertional impairment, such as pain, *unless the ALJ can support a finding that the nonexertional impairment is insignificant*.") (emphasis added).  An ALJ who does not find that a claimant has no significant nonexertional impairment is prevented from bypassing the vocational expert and relying conclusively on the Grids.  See Thompson, 987 F.2d at 1488;

28

see also Baker, 84 Fed.Appx. at 13.   The ALJ himself seemed to recognize this, having acknowledged in his otherwise thoughtful, thorough, and well-written opinion that "[w]hen the claimant . . . has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of 'disabled. . . .'" [AR at 64].

Under the circumstances, the Court concludes that the ALJ should have consulted and heard from the vocational expert who was present—but did not testify—at Mr. Becerra's hearing.   For this reason, the undersigned Magistrate Judge will recommend that Mr. Becerra's motion to reverse or remand be granted, and that this matter be remanded to the ALJ to conduct further proceedings consistent with what has been described more fully herein.

## III.   **CONCLUSION**

On the basis of the foregoing, it is the recommendation of the undersigned Magistrate Judge that Mr. Becerra's *Motion to Reverse or Remand Administrative Agency Decision* [Doc. 14] **GRANTED**, and that this matter be remanded to the ALJ, as described more fully herein.

_Lorenzo F. Garcia_  11/21/2011
Lorenzo F. Garcia
United States Magistrate Judge

29